UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FILED
SEP - 2 2016
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

LATISHA M. KING, )
)
    Plaintiff, )
)
v. ) 1:14-cv-01655 (IDD)
)
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security, )
)
    Defendant. )
)

## MEMORANDUM OPINION

This matter is before the Court on the parties' cross-motions for summary judgment (Dkt. Nos. 16, 18). Pursuant to 42 U.S.C. § 405(g), Latisha M. King ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") denying her claim for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401–434. For the reasons stated below, the Court finds that Defendant's decision is supported by substantial evidence, and that there is no evidence warranting remand. Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment and DENIES Plaintiff's Motion for Summary Judgment.

### I.    PROCEDURAL BACKGROUND

Plaintiff filed an application for disability insurance benefits on March 7, 2011, alleging disability since January 1, 2001, due to ventricular septal defect, uterine fibroid, aortic stenosis, bicuspid valve, enlarged heart, dizzy spells, palpitations, endometriosis, migraine headaches, and anxiety. (Administrative Record ("R.") 175, 179.) Plaintiff last met the insured status requirements of the Act ("date last insured") on September 30, 2007. (*Id.* at 165.) Plaintiff's

1

initial claim was denied on August 10, 2011, and again upon reconsideration on January 20, 2012. (*Id.* at 90, 102.) Plaintiff requested a hearing in front of an Administrative Law Judge ("ALJ") on September 20, 2012. (*Id.* at 7.) ALJ Thomas Mercer Ray conducted a hearing on June 18, 2013. (*Id.* at 26.)

On July 10, 2013, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act. (*Id.* at 12–14.) On October 7, 2014, the Appeals Council for the Office of Disability and Adjudication denied Plaintiff's request for review of the ALJ's decision, rendering the ALJ's decision the final decision of the Commissioner for purposes of review under 42 U.S.C. § 405(g). (*Id.* at 1–4.) Having exhausted her administrative remedies, Plaintiff filed the instant suit challenging the ALJ's decision on December 5, 2014. (Dkt. No. 1.) Plaintiff and Defendant filed cross-motions for summary judgment on May 2, 2016, and June 1, 2016, respectively, and this matter is ripe for disposition. (Dkt. Nos. 16, 18.)

## II. RELEVANT FACTUAL BACKGROUND

Plaintiff was born on February 9, 1976 and was 24 years old at her alleged onset date, January 1, 2001. (R. 162.) She has a high school education, one year of college, and a phlebotomy career studies certificate. (*Id.* 180.) She has previously worked as an administrative assistant, a call center clerk, and a phlebotomist. (*Id.* at 181.) She was laid off from her most recent full-time position in August 2001, when the telecommunications firm which employed her went bankrupt. (*Id.* at 211, 213.) From 2001 to 2010, she worked infrequently at a video store that she and her then-husband owned. (*Id.* at 213–15.) In a function report dated June 6, 2011, Plaintiff reported that she cared for her son, niece, and nephew but that she suffered pain when doing so and that other family members helped her. (*Id.* at 204.) Plaintiff reported that she also took care of her sister prior to her sister's death from cancer in 2010. (*Id.* at 202–03.) Plaintiff

reported significant pain when caring for herself but stated that she prepared meals, cleaned, did laundry, and shopped for food and other household goods. (*Id.* at 204–06.) Plaintiff also reported that she took part in social activities and took her son to engage in social activities. (*Id.* at 207–08.) Plaintiff reported that her impairments affected her ability to squat, bend, stand, walk, sit, kneel, climb stairs, complete physical tasks, and concentrate. (*Id.* at 208.)

## A. Medical Evidence

As a child, Plaintiff was diagnosed with congenital heart disease. (R. 793.) At age six, she had surgery to repair a patent ductus arteriosus. (*Id.*) She was followed by pediatric cardiology throughout her childhood. (*Id.*) Plaintiff's first visit to a cardiologist during the relevant period was a May 2001 appointment with Carey Marder, MD. (R. 767.) Plaintiff complained of heart palpitations and displayed a soft grade heart murmur, and Dr. Marder ordered heart monitoring for thirty days. (*Id.* at 767–69.)

In January 2003, Plaintiff saw Pradeep Nayak, MD, and reported heart palpitations "from time to time." (*Id.* at 764–66.) An echocardiogram suggested that Plaintiff suffered from mild aortic stenosis, but the test was not conclusive. (*Id.*) Dr. Nayak ordered additional tests, and, after reviewing them, recommended regular follow-up visits. (*Id.* at 760.) At Plaintiff's next appointment, in July 2003, she was eight weeks pregnant and reported no symptoms other than nausea. (*Id.* at 761.) In October 2003, Plaintiff visited Dr. Nayak and reported fast heartbeats and mild sweating on exertion but no dizzy spells. (*Id.* at 756.) Dr. Nayak found that Plaintiff's cardiovascular functioning was normal except for her heart murmur and reported that Plaintiff suffered from mild to moderate aortic insufficiency. (*Id.* at 758.) Dr. Nayak did not note any problems with Plaintiff's back or extremities in any of these appointments. (*See id.* at 758–66.)

In a February 2004 appointment with Robert Shore, MD, Plaintiff reported increased

palpitations and some chest discomfort. (*Id.* at 753–54.) Dr. Shore ordered a Holter monitor, which showed no sustained tachyarrhythmia. (*Id.* at 750.) At Plaintiff's follow-up two weeks later, Plaintiff reported no significant chest pain and no dizziness. (*Id.*) In March 2004, Plaintiff delivered a healthy child, and she followed up with Dr. Shore in May 2004. (*Id.* at 746.) She reported having no chest pain, no palpitations, and no heart failure symptoms. (*Id.* at 747.) Dr. Shore never noted any issue with Plaintiff's back or extremities. (*Id.* at 747–54.)

In early 2006, Plaintiff received a preliminary diagnosis of subaortic membrane from Dr. Nayak. (*Id.* at 895.) At that time, Plaintiff's only symptoms were heart palpitations and lightheadedness, which improved with increased sodium consumption. (*Id.*) Dr. Nayak recommended a cardiac catheterization to confirm the diagnosis. (*Id.* at 896.) The catheterization showed that Plaintiff had a bicuspid aortic valve, not a subaortic membrane. (*Id.* at 880.) In April 2006, Dr. Nayak noted that Plaintiff continued to be asymptomatic, recommended that Plaintiff resume regular aerobic exercise, and informed Plaintiff that her risk for pregnancy was slightly higher than average but acceptable. (*Id.* at 880–81.)

In March 2007, Dr. Nayak reported that Plaintiff was "doing very well" and was "quite active without difficulties," though she reported "occasional brief palpitations." (*Id.* at 874.) In October 2007, the month after Plaintiff's date last insured, Plaintiff followed up with Dr. Nayak upon returning from a trip to Cambodia. (*Id.* at 725.) Plaintiff reported palpitations and occasional sweating and dizziness. (*Id.*) Dr. Nayak recommended additional testing, (*Id.* at 727), which revealed nothing of concern. (*See id.* at 264, 872.) Also in October 2007, Dr. Nayak opined that Plaintiff could travel safely overseas to spend an extended amount of time in Cambodia. (*Id.*)

Plaintiff continued to see Dr. Nayak after she returned from Cambodia in 2009. (*Id.* at

870–90.) From 2009 through 2011, Plaintiff reported her usual palpitations and occasional lightheadedness. (*Id.* at 866, 861, 856, 850.) Dr. Nayak also noted that Plaintiff was under a great deal of stress due to her 2009 separation from her husband and the 2010 death of her sister. (*Id.* at 866, 856.) In September 2010, Plaintiff reported that she had been feeling very well, (*Id.* at 856), and in April 2011, Dr. Nayak reported that Plaintiff was doing well physically but was under a lot of stress personally. (*Id.* at 850.) Dr. Nayak's notes from Plaintiff's April 2011 appointment also state that Plaintiff denied having a history of back problems. (*Id.*)

Plaintiff also received treatment from gynecologist Karen R. Maser, MD, during the relevant period. (*See id.* at 584–684.) Dr. Maser noted that Plaintiff suffered from dysmenorrhea, menorrhagia, and uterine fibroids. (*Id.* at 593.) However, it does not appear that Dr. Maser ever diagnosed Plaintiff with endometriosis. (*See id.* at 584–684.) Dr. Maser referred Plaintiff to Salman Mufti, MD, for treatment of her uterine fibroids. (*Id.* at 316.) At her October 2009 appointment with Dr. Mufti, Plaintiff reported that she had no history of back pain or endometriosis. (*Id.* at 314.) It does not appear that Plaintiff ever received treatment for the uterine fibroids, possibly due to concerns about fertility. (*See id.* at 316.)

### B. Opinion Evidence

On September 14, 2012, Dr. Nayak completed a Clinical Assessment of Pain form and a Physical Capacities Evaluation form regarding Plaintiff's impairments. (R. 1397–39.) Dr. Nayak opined that Plaintiff's pain was present to such an extent as to be distracting to adequate performance of daily activities or work and that physical activity would greatly increase pain to such a degree as to cause distraction from or total abandonment of tasks. (*Id.* at 1397.) Dr. Nayak opined that the side effects of Plaintiff's prescribed medications would cause some limitations on Plaintiff's ability to perform work but not to such a degree as to create serious problems. (*Id.*) Dr.

Nayak further opined that Plaintiff could lift or carry twenty pounds occasionally and ten pounds frequently; could sit, stand, or walk for a total of five hours in an eight hour workday; could rarely bend or stoop; and could occasionally push, pull, and climb stairs. (*Id.* at 1398.) Dr. Nayak opined that Plaintiff would miss more than four days of work per month due to her impairments. (*Id.*) As the basis for the restrictions, he listed severe back problems, frequent knee pain, and gynecological disorders. (*Id.*) Dr. Nayak further noted that Plaintiff "also has [an] underlying congenital cardiac disease under close management/observation." (*Id.*)

Two State Agency medical consultants completed Physical Residual Functional Capacity ("RFC") Assessments for Plaintiff. (*Id.* at 86–87, 98–99.) On August 5, 2011, Catherine Howard, MD, opined that Plaintiff could lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently; could stand or walk for six hours in an eight hour workday; and could sit for six hours in an eight hour workday. (*Id.* at 86–87.) Dr. Howard further opined that Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. (*Id.* at 87.) On January 20, 2012, Martin Cader, MD, provided an opinion identical to Dr. Howard's. (*Id.* at 99.)

### C. Administrative Hearing Testimony

On June 18, 2013, Plaintiff testified at the hearing before the ALJ. (R. 26–78.) Plaintiff was 37 years old at the time. (*Id.* at 33.) She stated that she had lived in her parents' home with her parents, brother, and son since approximately 2012. (*Id.* at 35.) Before that, beginning in 2009, she lived at her sister's home with her sister, brother-in-law, niece, nephew, and son until her sister passed away in 2010. (*Id.* at 36.) She continued to live there through 2011, when her brother-in-law and his children relocated. (*Id.*) Before moving in with her sister, Plaintiff stated that she was in Cambodia for approximately one year with her then-husband, who worked for the

6

FBI. (*Id.* 37.) Before moving to Cambodia, Plaintiff reported that she lived in a home that she purchased with her then-husband in 2001. (*Id.* at 38.)

Plaintiff reported that she last worked at a video store that she owned with her then-husband. (*Id.* at 39.) She stated that she did not work there very often. (*Id.*) Plaintiff stated that, before working at the video store, she worked as an administrative assistant who checked emails and voicemails, arranged travel and schedules, and stocked office supplies. (*Id.* at 41.) Plaintiff stated that she continued that job for some months after January 2001, when she became disabled, and that she was sometimes allowed to work from home. (*Id.* at 42.) She left the position when she was laid off because the employer filed for bankruptcy, but she stated that her medical issues also contributed to her leaving. (*Id.* at 41–43.)

Plaintiff testified that, between January 2001 and September 2007, she suffered from shortness of breath, fatigue, dizziness, chest pain, and heart palpitations due to her heart condition. (*Id.* at 53–54.) Plaintiff also stated that she suffered from congestion. (*Id.* at 54.) Plaintiff stated that she suffered from dizzy spells and chest pain three to four times per month. (*Id.* at 54–55.) She experienced fatigue and shortness of breath almost every day. (*Id.* at 55.) Plaintiff also stated that she experienced headaches three to four times per month. (*Id.* at 60.) The headaches lasted for periods of a few hours to two days. (*Id.* at 61.) Plaintiff also suffered from pain during menstruation, which lasted up to two weeks per month. (*Id.* at 62.) Plaintiff also reported separate abdominal area pain, which was constant and which was sometimes accompanied by nausea, vomiting and diarrhea. (*Id.*)

Plaintiff reported that, during the relevant period, she could sit for approximately fifteen minutes, stand for fifteen to thirty minutes, and walk for approximately thirty minutes. (*Id.* 64–65.) On a typical day during the relevant period, Plaintiff would prepare meals for and play with

her son. (*Id.* at 66–67.) On Plaintiff's bad days, she would call her brother or sister to help care for her son. (*Id.* at 68.)

A vocational expert also testified at the hearing. (*Id.* at 69.) The ALJ asked the vocational expert what the exertional limitations would be for a hypothetical person of Plaintiff's age, education, and work experience who could lift, carry, push, or pull twenty pounds occasionally and ten pounds frequently; sit for six hours in an eight hour workday; and stand or walk for six hours in an eight hour workday. (*Id.* at 74.) The vocational expert stated that the individual would be at the light exertional level and would be able to perform Plaintiff's past relevant work. (*Id.*) The vocational expert further testified that a second hypothetical individual with the same education and work experience as Plaintiff who was limited to sedentary work and who would have to miss four days of work per month would not be capable of performing any unskilled occupations. (*Id.* at 75.) The vocational expert further testified that another hypothetical individual who had the same limitations as the first hypothetical individual but who could only stand or walk for two hours per day and sit for three hours per day would not be able to perform any occupation because the individual could work for only five hours, not a full workday. (*Id.* at 76–77.)

### III. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, this Court is limited to determining whether that decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401

(1971); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). It is more than a mere scintilla, but less than a preponderance. *Id.* If the ALJ's determination is not supported by substantial evidence in the record, or if the ALJ has made an error of law, the district court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). In reviewing the record for substantial evidence, the court should not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. *Perales*, 402 U.S. at 390. With this standard in mind, the Court evaluates the ALJ's findings and decision.

## IV. ANALYSIS

### A. Determining Disability and the Sequential Analysis

The Social Security Regulations define "disability" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). To meet this definition, the claimant must have a severe impairment or impairments that make it impossible to do past relevant work, or any other substantial gainful activity that exists in the national economy. *Id.*; *see Heckler v. Campbell*, 461 U.S. 458, 460 (1983). The ALJ is required to employ a five-step sequential evaluation in every Social Security disability claim analysis to determine the claimant's eligibility. Specifically, the ALJ must consider whether the claimant: (1) is engaged in substantial gainful activity ("SGA");[1] (2) has a severe impairment; (3) has an

---

[1] Substantial gainful activity is work that is both substantial and gainful as defined by the Agency in the Code of Federal Regulations. Substantial work activity "involves doing significant physical or mental activities. Your work

9

impairment that equals a condition contained within the SSA's official Listing of Impairments; (4) has an impairment that prevents past relevant work;[2] and (5) has an impairment that prevents him from any substantial gainful employment. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

### B. ALJ's Findings

In accordance with the five-step sequential analysis, the ALJ made the following findings of fact and conclusions of law. First, the ALJ determined that Plaintiff had not engaged in SGA during the period from her alleged onset date, January 1, 2001, through her date last insured, September 30, 2007. (R. 17.) Next, the ALJ concluded that Plaintiff suffered from the following severe impairments: congenital heart disease and subaortic membrane. (*Id.* at 18.) In evaluating the effect the severe impairments have on Plaintiff's functioning, the ALJ stated that "the impairments cause more than a minimal restriction on the [Plaintiff's] work-related activities."[3] (*Id.*) The ALJ did not find, however, that these impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) Fourth, the ALJ determined that, through Plaintiff's date last insured, Plaintiff had the RFC to:

> perform a full range of light work as defined in 20 CFR 404.1567(b). The claimant can occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; sit, stand, or walk (with normal breaks) for a total of six hours in an eight-hour workday; and push or pull (including the operation of hand and/or foot controls) as much as she can lift or carry.

---

may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks, hobbies, therapy, school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

[2] Past relevant work is defined as substantial gainful activity in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 404.1560(b), 404.1565(a).

[3] In addition, the ALJ found that Plaintiff had the following non-severe impairments: acute sinusitis, acute diarrhea, bronchitis, candidiasis of the vulva, strep throat, cough, cellulitis/abscess of the leg, and headache. (R. 18.) The ALJ found that Plaintiff's non-severe impairments were "treated successfully with conservative medical treatment and were generally short lived (less than 12 months in duration) and so did not even minimally limit [Plaintiff's] functional capacity." (*Id.*)

(*Id.* at 490.) Fifth, the ALJ concluded that, through Plaintiff's date last insured, Plaintiff was capable of performing past relevant work as a phlebotomist, appointment clerk, and data entry clerk/secretary. (*Id.* at 24.) Therefore, the ALJ determined that Plaintiff was not under a disability at any time during the relevant time period, from the alleged onset date through the date last insured. (*Id.* at 25.)

### C. Cross-Motions for Summary Judgment

In the Memorandum in Support of Plaintiff's Motion for Summary Judgment, Plaintiff argues that the ALJ failed to properly evaluate the opinion of Dr. Pradeep Nayak, Plaintiff's treating physician. (Dkt. No. 10, at 5.) Plaintiff argues that the ALJ erroneously: (1) failed to evaluate whether Dr. Nayak's opinion should be afforded controlling weight; (2) failed to properly evaluate Dr. Nayak's opinion apart from the controlling weight analysis; and (3) rejected Dr. Nayak's opinion because it was rendered five years after Plaintiff's date last insured. (*Id.* at 7–9.) Defendant seeks summary judgment on the ground that the ALJ's decision is supported by substantial evidence and, therefore, should be affirmed. (Dkt. No. 19, at 14–23.) Defendant's briefing focuses on disputing the arguments propounded by Plaintiff. (*See id.*) Therefore, the Court will address each of Plaintiff's objections to the ALJ's decision in turn.

#### 1. Evaluation of Physician Opinion Evidence Regarding Controlling Weight

Plaintiff contends the ALJ failed to properly evaluate whether the opinion of Plaintiff's treating physician, Dr. Nayak, should be given controlling weight. (Dkt. No. 17, at 8.) Plaintiff further argues that the ALJ failed to consider whether the opinion was a medical opinion, whether the opinion came from a treating source, whether it was well supported by diagnostic techniques, and whether it was inconsistent with other evidence. (Dkt. No. 17, at 9.)

While the medical opinions of treating physicians are generally given controlling weight, the ALJ is not required to accept those opinions when they are not well-supported or are inconsistent with other substantial evidence in the record. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). Furthermore, a treating source's medical opinion is only entitled to controlling weight where the ALJ finds "that the treating source's medical opinion is 'well-supported' by 'medically acceptable' clinical and laboratory diagnostic techniques." SSR 96-2p, 1996 WL 374188, at *2 (S.S.A.). If a medical opinion is inconsistent with other substantial evidence or if it is not supported by clinical evidence, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).

Here, the ALJ determined that, although Dr. Nayak was Plaintiff's treating physician, his opinion regarding the nature and severity of Plaintiff's impairments deserved only limited weight. (R. 24.) The ALJ explained that Dr. Nayak's opinion was "not consistent with medical evidence, including Dr. Nayak's own findings," that establishes that during the relevant period, "[Plaintiff's] heart condition was effectively controlled with medical treatment and did not prevent her from leading an active life as well as caring for her son, her ailing sister, and the sister's child." (*Id.*)

The ALJ notes, and the record supports, that Plaintiff's heart condition did not cause significant difficulties in her 2003 pregnancy or 2004 birth. (*See id.* at 619–20; 758–61.) Furthermore, even when, in 2006, diagnostic tests suggested complications with Plaintiff's heart condition, her symptoms remained mild. (*Id.* at 895.) In April 2006, Dr. Nayak noted that Plaintiff "continue[d] to be asymptomatic," suggested that Plaintiff engage in aerobic exercise,

and informed Plaintiff that her risk for pregnancy was slightly higher than average but acceptable. (*Id.* at 880–81.) In March 2007, Dr. Nayak noted that Plaintiff was "doing very well" and was "quite active without difficulties." (*Id.* at 874.)

The ALJ must only give controlling weight to treating physicians if their opinions are not inconsistent with other substantial evidence in the record. Here, the ALJ appropriately evaluated Dr. Nayak's opinion as a treating physician's opinion. Based on the ALJ's findings that Dr. Nayak's opinion supporting disability was internally inconsistent and inconsistent with the record as a whole, the ALJ had discretion to give the opinion less weight, regardless of Dr. Nayak's status as a treating physician. This Court is persuaded that the ALJ considered Plaintiff's entire record and evaluated the relevant factors for giving a treating physician's opinion less than controlling weight. The ALJ sufficiently articulated the reasons for this determination, and his treatment of Dr. Nayak's opinion is in accord with the regulations and supported by substantial evidence in the record. Therefore, the undersigned finds that the ALJ did not err in giving Dr. Nayak's opinion less than controlling weight and that he adequately explained why he did so.

**2. Evaluation of Opinion Evidence Apart From the Controlling Weight Analysis**

Plaintiff next argues that the ALJ failed to properly evaluate Dr. Nayak's medical opinion apart from the controlling weight analysis. (Dkt. No. 17, at 9.) If an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in deciding the weight to be given to the physician's opinion: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; (5) whether the physician is a specialist in the area in which he is

rendering an opinion; and (6) any other relevant factors brought to the ALJ's attention. 20 C.F.R. § 404.1527(c), (e). If a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight. *See Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). Finally, the ALJ need only be specific enough to allow a reviewing court to determine the weight given to a medical source and the reasons for that weight. *See* SSR 96-2p, 1996 WL 374188, at *5 (S.S.A.).

Here, the ALJ determined that Dr. Nayak's opinion was entitled to only limited weight. (R. 24.) The ALJ noted that Dr. Nayak had treated Plaintiff during the relevant time period, between 2001 and 2007. (*Id.*) The ALJ further noted that Dr. Nayak was a treating cardiologist who was opining about the symptoms of Plaintiff's heart condition. (*Id.*) However, the ALJ also explained that Dr. Nayak's opinion was inconsistent with medical evidence on the record, including his own findings, which establishes that during the relevant period, Plaintiff's heart condition was controlled with medical treatment. (*Id.*) The ALJ further explained that Dr. Nayak rendered his opinion five years after Plaintiff's last insured date, and that, therefore, the opinion did not provide a contemporary assessment of Plaintiff's condition during the relevant period.[4] (*Id.*) As discussed above, the ALJ noted substantial medical evidence in the record, including Dr. Nayak's own findings, that was inconsistent with Dr. Nayak's opinion. The ALJ evaluated the appropriate factors, and the ALJ's determination is supported by substantial evidence in the record. Therefore, the undersigned finds that the ALJ did not err in giving Dr. Nayak's opinion limited weight.

---

[4] Plaintiff's argument that it was improper for the ALJ to consider the timing of Dr. Nayak's opinion is evaluated below.

14

### 3. Consideration of Timing of Physician's Opinion

In her last claim of error, Plaintiff argues that the ALJ erroneously rejected Dr. Nayak's opinion on the basis that the opinion was rendered five years after Plaintiff's date last insured. (Dkt. No. 17, at 7.) In *Bird v. Commissioner of the Social Security Administration*, the Fourth Circuit Court of Appeals found that an ALJ erred by giving "little" weight to a treating physician's opinion on the basis that the opinion was rendered after the claimant's date last insured.[5] *Bird v.* 699 F.3d 337, 340–41 (4th Cir. 2012). The court held that it is error to reject a treating physician's opinion on the sole basis that it was rendered after the claimant's date last insured. *Id.* at 341. The court explained that "[m]edical evaluations made after a claimant's status has expired are not automatically barred from consideration and may be relevant to prove a disability arising before a claimant's [date last insured]." *Bird*, 699 F.3d at 340 (citing *Wooldridge v. Bowen*, 816 F.2d 157, 160 (4th Cir. 1987)). Pursuant to *Bird*, "retrospective consideration of evidence is appropriate when 'the record is not so persuasive as to rule out any linkage' of the final condition of the claimant with his earlier symptoms." *Bird* 699 F.3d at 341 (quoting *Moore v. Finch*, 418 F.2d 1224, 1226 (4th Cir. 1969)). Because the physician's opinion in *Bird* discussed pre– and post–date last insured symptoms of an impairment which existed prior to the claimant's date last insured, the court found that there was linkage and that the ALJ erred in assigning the opinion little weight on the basis that it was rendered after the claimant's date last insured. *Id.* at 342.

In this case, the ALJ gave "limited" weight to Dr. Nayak's opinion because it was inconsistent with Dr. Nayak's own findings and other medical evidence in the record and

---

[5] In her brief, Plaintiff relies on *Bird*'s predecessor, *Wooldridge v. Bowen*. (Dkt. No. 17, at 7.) In *Wooldridge*, the ALJ gave no weight to an opinion issued after the claimant's date last insured, while in the case at bar and *Bird*, the ALJ gave "limited" and "little" weight, respectively, to the post–date last insured opinion. *See Bird*, 699 F.3d at 340; *Wooldridge*, 816 F.2d 157, 160 (4th Cir. 1987); (R. 24.) The undersigned applies the reasoning and rule from *Bird*, as it is more analogous to the case at bar.

because it did "not provide a contemporary assessment of [Plaintiff's] medical condition during her period of alleged disability," as the opinion was rendered five years after Plaintiff's date last insured. (R. 24.) Dr. Nayak based his opinion on Plaintiff's knee and back problems, gynecological disorders, and heart condition. (*Id.* at 1398.) The record contains evidence that Plaintiff had suffered from a heart condition, which the ALJ deemed severe, and gynecological disorders, since before her date last insured. (*See, e.g., id.* at 593, 793.) Thus it appears that there is linkage between Plaintiff's post–date last insured symptoms and her pre–date last insured condition, and, therefore, that it would be error to neglect to consider Dr. Nayak's opinion for the sole reason that it was provided after Plaintiff's date last insured.

However, Dr. Nayak's opinion listed knee and back problems as additional impairments, (*Id.* at 1398), although the record shows that these impairments did not exist until after Plaintiff's date last insured. (*See, e.g., id.* at 222–23, 312.) For example, Plaintiff denied a history of back problems in 2009, (*id.* at 312), and stated that her knee pain arose after April 2011, (*id.* at 222–23.) Therefore, there is no linkage between Plaintiff's pre–date last insured condition and the post–date last insured symptoms of her knee and back problems. Neither *Bird* nor any case cited by Plaintiff states that an ALJ may not even consider the fact that an opinion was given after the date last insured when determining weight, especially when some of the impairments noted in the opinion were not present before the date last insured. Therefore, the ALJ did not err in considering the timing of Dr. Nayak's opinion in his weight determination.

Furthermore, the ALJ provided an additional reason for giving Dr. Nayak's opinion limited weight: that the opinion was inconsistent with Dr. Nayak's own findings and other medical evidence in the record. (*Id.* at 24.) As discussed above, substantial evidence in the record

supports the ALJ's decision to give Dr. Nayak's opinion limited weight because of the inconsistency. Therefore, any error in the linkage determination would be harmless.

This Court's role is not to weigh the conflicting evidence or substitute its judgment for that of the ALJ. Based on a thorough review of the record and the ALJ's decision, this Court finds the ALJ correctly followed the treating physician rule in evaluating the proper weight to be given to Dr. Nayak's opinion. Thus, this Court concludes that the ALJ's decision is supported by substantial evidence, and summary judgment should be granted in favor of Defendant.

## V. CONCLUSION

For the foregoing reasons, the Court finds the ALJ's decision is supported by substantial evidence and does not contain legal error. Therefore, Plaintiff's Motion for Summary Judgment, shall be DENIED, and Defendant's Motion for Summary Judgment shall be GRANTED. An appropriate Order will follow.

/s/
Ivan D. Davis
United States Magistrate Judge

September 2, 2016
Alexandria, Virginia